NO. 07-01-0375-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

DECEMBER 11, 2001

_____


ANDERSON CHEMICAL COMPANY, INC., APPELLANT

V.

ART GREEN, INDIVIDUALLY, AND ALPHA LABS, INC., APPELLEES


_____

FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2001-514,900; HONORABLE J. BLAIR CHERRY, JUDGE

_____

Before BOYD, C.J., and QUINN and REAVIS, JJ.


Appellant Anderson Chemical Company, Inc. brings this interlocutory appeal from

the denial of a temporary injunction. Appellant sought a temporary injunction prohibiting

appellees Art Green (Green) and Alpha Labs, Inc. (Alpha) from violating Green's covenant

not to compete with appellant, to prohibit the disclosure of confidential information, and to

prevent the solicitation of other employees of appellant. In two issues which are argued

together, appellant contends the trial court misapplied the law to the facts of the case. It also contends the evidence presented at the hearing by both parties "does not support the order." Disagreeing that either issue presents reversible error, we affirm the judgment of the trial court.

Green worked for appellant as a salesman of water treatment systems from 1990 until July 5, 2001, at which time he went to work for Alpha, a competitor. The parties stipulated that Green signed an employment agreement with appellant in 1990 that contained a covenant not to compete. Since terminating his employment with appellant, Green has solicited customers he had serviced while employed by appellant within the geographic area proscribed by the employment agreement. Although it initially issued a temporary restraining order, on August 28, 2001, at a hearing on appellant's request, the trial court declined to issue a temporary injunction without stating the basis for its ruling.

The purpose of a temporary injunction is to preserve the status quo pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). To be entitled, an applicant must show a probable injury and a probable right of recovery at the final hearing. *Id.* at 57. We review the denial of a request for temporary injunction under an abuse of discretion standard, and we may not reverse that decision absent an abuse of that discretion. *Id.* at 58. A court abuses its discretion when it misapplies the law to the facts or when the evidence does not reasonably support the findings. *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). In making our review, we draw all

2

legitimate inferences from the evidence in the light most favorable to the trial court's judgment. *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 598 (Tex.App.--Amarillo 1995, no writ). Where, as here, the trial court does not make findings of fact and conclusions of law, the judgment may be upheld on any legal theory supported by the record. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

Whether a covenant not to compete is enforceable is a question of law. *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex. 1994). A covenant not to compete is enforceable if it is ancillary to, or part of, an otherwise enforceable agreement at the time the agreement is made. However, the covenant is only enforceable to the extent that it contains reasonable limitations as to time, geographic area, and if the scope of activity to be restrained does not impose greater restrictions than necessary to protect good will or other business interests. Tex. Bus. & Com. Code Ann. § 15.50(a) (Vernon Supp. 2001).

In his contract, and in relevant part, Green agreed:

(a) Non-competition.  The Employee covenants and agrees that, for a period of one (1) year from the termination of the Employee's employment for any reason whatsoever, with the exception of the points discussed in paragraph 2 of this agreement, the Employee will not within the Territory directly or indirectly compete with the Employer by carrying on a business which is substantially similar to the Business (as defined in subsection (d)). . . .

*   *   *

(d) Business.  For purposes of this Agreement, the term "Business" shall mean (i) the sale or solicitation of sales of chemical products relating to the

3

treatment and conditioning of water and other substances and comparable to the Products hereunder as of the termination of employment, (ii) the servicing of the accounts of the purchases of such products, or (iii) both (i) and (ii).

By map and in writing, the "Territory" was defined to be an area in West Texas. The court indicated at the hearing that it was not concerned with the issue of the reasonableness of the limitations of the covenant, and it did not abuse its discretion in that regard.

Thus, section 15.50 requires that we determine if there is an otherwise enforceable agreement to which the covenant not to compete was ancillary to, or a part of, at the time it was made. *Light*, 883 S.W.2d at 644. An "otherwise enforceable agreement" can result from at will employment as long as the consideration for the promise is not illusory. *Id.* at 645. Any promise that depends on an additional period of employment is illusory because it is conditioned on something within the exclusive control of the employer who retains the option of discontinuing employment. *Id.* n.5.

In his employment contract, Green made a number of non-illusory promises to appellant, which include:

1. Upon termination, to return all of appellant's property.

2. For one year after his termination, not to induce any employee of appellant to go to work for any other employer.

3. Upon termination, to keep confidential appellant's pricing information, marketing information, sales technique or any other confidential information, including client and customer lists, client requirements, terms of contracts with clients and planning and financial information of appellant.

4

4. To give ten days notice prior to terminating his employment.

In order to form an enforceable agreement, appellant must have given some corresponding non-illusory promise to Green. *See CRC-Evans Pipeline Intern. v. Myers*, 927 S.W.2d 259, 263 (Tex.App.--Houston [1st Dist.] 1996, no writ). A promise not to disclose an employee's proprietary information which is later accepted by the employer's performance in providing that information to the employee is a unilateral contract that cannot support a covenant not to compete because it is not otherwise enforceable **at the time it is made.** *Light*, 883 S.W.2d at 645, n.6. The instant agreement contains no promise on the part of appellant to furnish Green with confidential information. Thus, even if appellant gave such information to Green, at the time it was made, there was no enforceable agreement.

Appellant also promised that if it failed to make Green the manager of its West Texas territory when Bill Dawson ceased to work for it, the non-compete agreement would not bind Green. Specifically, that clause provides:

> Bill Dawson of 5 Winged Foot Circle, Abilene, Texas, is currently employed by Employer; upon Bill Dawson's ceasing to work for Employer, then West Texas will become its own territory and 25% of the sales in this territory will go to the territory. At this time Employee will become the manager of this territory based upon Employee's ability to meet past and current agreed performance parameters.
>
> Should Employer not live up to this part of the contract then Employee may terminate this contract with 10 days written notice. Should Employee wish to terminate this agreement do [sic] to Employer's noncompliance with this

specific paragraph, Employee will not be bound by the non-compete clause of this agreement.

It readily appears that this provision is conditioned on Green's continued employment with appellant until such time as Bill Dawson ceased to work for appellant. While appellant argues that the clause had no effect until Green's termination, under the contract, appellant could terminate Green at any time prior to the time Dawson left his employment with appellant. That being so, the promise was illusory. Therefore, it can be said that an enforceable agreement existed only insofar as Green was required to return appellant's property upon termination, refrain from inducing other employees to leave appellant, and to give ten days notice prior to termination in exchange for appellant's obligation to give ten days notice prior to its termination of Green's employment.

However, our inquiry does not end at this point. We must determine whether the consideration given by the employer to the employee in the otherwise enforceable agreement is sufficient to justify the employer's interest in restraining the employee from competing. *Light*, 883 S.W.2d at 647. The covenant must also be designed to enforce the employee's return promise in the otherwise enforceable agreement. *Id.* In this case, appellant's promise to give ten days notice prior to a termination of Green's employment is not sufficient to give rise to any interest it might have in restraining Green from competition. *See Donahue v. Bowles, Troy, Donahue, Johnson, Inc.,* 949 S.W.2d 746, 752 (Tex.App.--Dallas 1997, writ denied). That being true, the trial court would not have

abused its discretion in concluding that the covenant not to compete was not ancillary to, or a part of, the otherwise enforceable agreement.

Moreover, even if the requirements of section 15.50 had been met, the trial court could have found appellant failed to show a probable right to relief because Green terminated his employment pursuant to the provision of the contract that allowed him to do so if his termination was because of appellant's failure to honor its commitment to make him area manager based on Green's ability to meet past and current agreed performance parameters. The evidence showed that although Green had been made an area manager, one year prior to his termination, appellant eliminated the position, with the exception of one area not included in Green's area. The evidence also showed that Green had received numerous awards and favorable comments from his supervisors with no negative comments in his personel file. Even though the contract did not specifically forbid the elimination of the position of area manager, there was evidence to support a conclusion that Green was entitled to use the escape provision.

We must now determine if the trial court abused its discretion in failing to grant a temporary injunction to protect against the disclosure of confidential information. A non-disclosure provision may be enforceable even if a non-compete provision is not enforceable and such a provision is not required to contain reasonable restrictions as to time, geography, and scope of activity. *Zep Mfg. Company v. Harthcock,* 824 S.W.2d 654, 663 (Tex.App.--Dallas 1992, no writ). Green's contract provided in pertinent part:

7

8. Trade Secrets. Employee hereby recognizes that unpublished items of technical or non-technical information, such as (but not limited to) Product chemical compositions and chemical properties, formulas, chemical dosage calculation procedures, marketing plans and direct selling systems, customer lists, supplier lists and technical and commercial information relating to customers or business projects used by Employer in it's [sic] business, constitute valuable trade secrets or confidential information (referred to hereafter collectively as "Trade Secrets") which are the property of Employer. Employee shall not disclose or use Trade Secrets other than in the business of Employer. Employee specifically agrees:

(a) Not to directly or indirectly, disclose or make available to anyone not employed or affiliated with Employer or use outside of the Employer organization during or after his employment any Trade Secret;

(b) To safeguard all Trade Secrets at all times so they are not exposed to, or taken by, the unauthorized persons, and when entrusted to him, to so exercise his best efforts to assure their safe-keeping;

(c) To deliver in the event of termination of his employment, as provided in paragraph 4, all of Employer's property, including personal notes and reproductions, relating to Employer's business and Trade Secrets in his possession or control; . . .

9. Confidential data. The Employee further agrees that the Employee will keep confidential and not directly or indirectly divulge to anyone, nor use or otherwise appropriate for the Employee's own benefit, any pricing information, marketing information, sales technique of the Employer or any other of the confidential information or documents of or relating to the Employer, including but not limited to, confidential records, computer software programmes [sic] or any portions or logic comprising said programmes [sic] client and customer lists, information about client requirements, terms of license agreements, terms of contracts with clients and customers, and planning and financial information of the Employer (hereinafter referred to as the "Confidential Data") . . . .

At the hearing, Green admitted that since he went to work for Alpha, he has called on, and accepted, clients or customers that were his while he worked for appellant. However, he testified that "any water treatment salesman, working a particular town, is

8

going to know who the largest accounts are and should know who is servicing those accounts. It is nothing secret." Green had access to pricing and product information while working for appellant, and in one instance, after commencing work for Alpha, a former customer gave him a list of appellant's chemicals and asked Green for a recommendation on pricing. Green knew what those chemicals were and what they were used for without having to consult any of appellant's materials.

Nevertheless, Green averred, he had returned appellant's materials to it upon his termination and did not have any customer lists or pricing lists. Also, appellant did not share its formulas with Green. He did have access to chemical information on drums supplied to customers, but they are the same products used by any water treatment company. Before giving any bids to a previous customer of appellant's, Green went and visited with the customer to ascertain their needs, even though he may have had some knowledge of those needs before the visit. As an Alpha employee, he used Alpha's price list in preparing his bids. Those price lists are the same for all customers, except one list includes freight and one does not. In one instance, Green informed Alpha that appellant used a particular model of a pump that could be ordered by anyone.

Mike Povlinko, Green's former supervisor with appellant, testified that appellant's confidential information includes price books, pricing information on its products, proprietary formulations of its products, product application and control guidelines, customer lists, billing information, customer contacts, and phone numbers. He testified

9

that if a competitor knew appellant's pricing structure, they could under price appellant. Additionally, he opined, if a competitor knows the chemical specifications and formulations of the products, he would know how a particular product performed in the system and whether it would keep the customer's equipment safe and clean. He averred that Green had access to price lists, customer lists, and products and application guides.

However, Povlinko admitted he did not have any nondisclosure agreement with appellant, although he probably had access to more information than Green. Furthermore, there were other regional sales managers that did not have such agreements. Povlinko also admitted that Green did not have access to the company formulas, the cost of products other than pricing information for his territory, locked files, or to password-only computer networks. He agreed that those in the industry pretty well know who the large potential customers are in any given town or city and who is currently servicing those customers. He also admitted that "there really are not many secrets in the chemical business."

Gary Riddle, a technical service technician for appellant, stated that if Green walked onto a site and saw one of appellant's drums, he would know more than the average competitor about what was in it because the number on the drum identifies the strength of the chemical. Green would not have to have the contents tested to know which of Alpha's products might be comparable to it. Riddle admitted that although the chemicals and

10

equipment may change, the general knowledge can be applied from one competitor to the next.

Hal Guymon, appellant's executive vice president, testified that appellant's confidential information includes customer lists, price information, information on product application, and the information used to develop bids for customers, including calculation programs. If Green had artificially inflated prices while he was still employed by appellant, it would give him an advantage when he went to work for a competitor because he could then undercut those prices. Although he considered appellant's customer list confidential, Green agreed that those in the industry basically know which company is servicing which client.

Steve Price, president of Alpha, was reluctant to name his biggest accounts, although he agreed that everyone in the industry knows the major prospects in a town who are buying water treatment, and that his major competitors have a good idea of the volume of his accounts. In any particular town, he would look at hospitals, offices, buildings, large manufacturing plants, and processing plants as potential customers because they have steam boilers and cooling tower systems. Therefore, it is not difficult to identify potential customers. Furthermore, information as to which entities use boilers can be obtained from the State Licensing Bureau. Price admitted that Green probably had a lot of knowledge about appellant's customers, which is a competitive advantage for Green, but he averred that Green had never given him any of appellant's pricing and that he could not remember

11

anything about his own company's price list from memory. Price also stated that Green had no authority to alter Alpha's pricing and that no former client of appellant had been given special pricing by Alpha. He agreed there were not many secrets in the chemical business because everyone is using the same thing, just different chemicals and applications depending on the customers' needs. Prior to the time Green went to work for Alpha but while he was considering doing so, Green did mention a specific modification by appellant to some equipment, although Price stated the same information would have been available to him from the seller of the equipment.

In addition to contractual obligations, there is a common law duty of an employee not to use confidential or proprietary information acquired during the relationship adversely to his employer, and that obligation survives the termination of employment. Thus, while a former employee may use the general knowledge, skill, and experience acquired during the employment relationship, he may not utilize confidential information or trade secrets acquired during the employment relationship. *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex.App.--Waco 1996, no writ); *Miller,* 901 S.W.2d at 598. Protected data includes compilations of information which have a substantial element of secrecy and provide the employer with an opportunity for advantage over competitors. *Miller*, 901 S.W.2d at 601; *Rugen v. Interactive Business Systems, Inc.,* 864 S.W.2d 548, 552 (Tex. App.--Dallas 1993, no writ)*.* Examples include pricing information, customer lists, client information, customer preferences, buyer contacts, and market strategies. *Miller*, 601 S.W.2d at 601.

However, even if certain business information is confidential, the same information may be capable of being obtained by observation, experimentation, inspection, analysis, or general inquiry. *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632 (Tex. App.--Houston [14th Dist.] 1992, writ denied); *Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 275 (Tex.Civ.App.--Texarkana 1980, writ ref'd n.r.e.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981). Even so, the information can still be protected if the competitor gains it through a breach of confidence without the efforts of observation, experimentation, inspection, analysis or general inquiry. *Dannenbaum*, 840 S.W.2d at 632.

The evidence here showed that Green did not take any of appellant's materials with him when he left. Although he knew the names of customers and the approximate amount of their accounts, there was testimony that the same information was generally known by other competitors. Green had no access to appellant's formulas, and other information about the contents of drums supplied to customers was written on the drum itself and available to see. There was also evidence that Green spoke personally to each former client of appellant that he now services. His purpose was to obtain information about their needs and to inform them that he was bound to use the Alpha price schedule, which was the same for every customer, except for freight charges. The products and equipment used in the industry are available to everyone, and differences that arise do so because of the needs of different customers. It was generally agreed by all parties that although the water treatment industry is a highly competitive one, there are generally few secrets.

13

Construing the evidence in the light most favorable to the court's ruling, the trial court could reasonably have found that appellant did not show a probable right to recover on the claims of breach of confidentiality, misappropriation and conversion of private information, and breach of fiduciary relationship. This is true because the information Green received from appellant was either not proprietary or, if he did receive confidential information, he had not used it adversely to appellant.

We next consider the non-solicitation clause in Green's contract. That clause provided:

> 5. <u>Non-solicitation of Employees.</u> The Employee covenants that during the periods for which he is entitled to compensation or other payment hereunder, and during the one (1) year period immediately following the last of such periods, the Employee shall neither directly nor indirectly induce or attempt to induce any Employee of the Employer to terminate his or her employment to go to work for any other employer, and during such period, the Employee such [sic] not directly or indirectly hire any employee or former employee of the Employer.

During the hearing, Gary Riddle testified that the same week that Green gave his resignation to appellant, he had seen an advertisement in the newspaper for employees. Later, according to Riddle, Green told him that the advertisement had been placed there for Riddle's benefit. Riddle said he took this to mean that although the advertisement did not identify Alpha as the hiring company, Alpha was trying to offer him a job. Green told Riddle that he, Green, did not place the ad, but he could not say anything else and that the information should remain between him and Riddle.

14

Steve Price testified that Alpha ran an advertisement in the San Angelo Times and perhaps in Abilene seeking an experienced water treatment employee. Although Green was not yet officially an employee of Alpha, he told Green about the advertisement. Price stated that anyone could have answered the advertisement. Green denied that he told Riddle the advertisement was placed for his benefit. Rather, he averred, he told Riddle that if a competitor was interested in hiring employees from another company, it was better if the employee approached the new company. Green also said that other competitors would have been targeted by the ad as well as appellant.

Although the evidence is somewhat conflicting, it is sufficient to support a conclusion by the trial court that the advertisement was not targeted specifically at any particular person, but rather aimed at any qualified water treatment person interested in employment with another company. It would also support a conclusion that Green was not an instigator of the advertisement and that he did not actually tell Price that the advertisement was specifically for Riddle's benefit. It is well established that a trial court does not abuse its discretion in basing a decision as to a probable right to recover on the resolution of conflicting evidence in the record. *Davis v. Huey*, 571 S.W.2d at 862. That being true, we cannot say that the court would have abused its discretion in concluding that appellant had not shown its probable right to recover for breach of the covenant in question here.

In summary, we have found no abuse of discretion by the trial court in arriving at its decision. Accordingly, we overrule appellant's issues and affirm the judgment of the trial court.


John T. Boyd
Chief Justice

Publish.