NO. 07-02-0315-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 12, 2003

______________________________

TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER, APPELLANT

V.

SANDEEP RAO, APPELLEE

_________________________________

FROM THE 99
TH
 DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2002-517,844; HONORABLE MACKEY K. HANCOCK, JUDGE

_______________________________

Before JOHNSON, C.J., QUINN, J., and BOYD, S.J.
(footnote: 1)
OPINION

This is an interlocutory appeal from a trial court order overruling a plea to the jurisdiction and granting a temporary injunction.  For reasons we later state, we modify the temporary injunction and, as modified, affirm the trial court order.

The suit giving rise to the temporary injunction was brought by appellee Sandeep Rao (Rao) against appellant Texas Tech University Health Sciences Center (Tech).  In the suit, Rao asserted his free speech rights had been circumscribed by Tech’s action in dismissing him from Tech’s School of Medicine and sought equitable relief requiring Tech to reinstate him.  He sought, and obtained, the temporary injunction with which we are concerned in which Tech was ordered to immediately reinstate Rao “as a student in good standing.”

Factual Background

In  2002, Rao was enrolled at Tech in the second year of a joint MD/MBA program.  He also served as a columnist on Tech’s student newspaper, the
 University Daily
.  On January 21, 2002, Rao and another student attended an autopsy
(footnote: 2) conducted by Dr. Jerry Spencer, the director of Tech’s Division of Forensic Pathology.  Dr. Spencer was also the Lubbock County Medical Examiner.  Prior to attending the autopsy, Rao signed a confidentiality agreement in which he agreed he would not reveal the name of the decedent or  “discuss the nature of any diagnosis or facts of the case with anyone outside of the professional staff.”

On January 24, 2002, Rao wrote a column in the
 University Daily 
about his autopsy experience.  In the column, with some particularity, he described the date and time of the autopsy, that it was performed by Dr. Spencer, and the stated cause of death.  He also made some remarks about Dr. Spencer’s demeanor as he conducted the autopsy.  On January 27, 2002, Dr. Spencer filed a complaint with Dr. Terry McMahon, the Associate Dean for Education Programs, in which he alleged that in publishing the column, Rao had violated portions of the University Code of Professional and Academic Conduct. In particular, he claimed that Rao had failed to comply with directions of university officials, had failed to comply with the confidentiality agreement, and had made derogatory remarks about Dr. Spencer.

After receiving the complaint, Dr. McMahon notified Rao of the allegations and set a hearing for February 18, 2002.  On February 21, 2002, as a result of the hearing, Dr. Richard Homan, the Dean of the Schools of Medicine and Biomedical Sciences, notified Rao that the Hearing Committee had recommended that he be dismissed and that Dr. Homan saw no reason not to accept the recommendation.  Dr. Homan also advised Rao of his right to appeal the decision to an appeal panel.  A hearing was held before the appeal panel on March 8, 2002.  On March 18, 2002, Rao was notified that the appeal panel had found against him on the charge of unprofessional conduct, had recommended that Rao receive probation through his third year clerkships and be required to write letters of apology to the university paper and to Dr. Spencer.

Additionally, on February 21, 2002, Dr. McMahon formally notified Rao of allegations  against him of academic dishonesty in connection with the alleged offer to deliver a copy of a past year’s neurosciences exam that had not been released as a study aid.  A hearing on that allegation was conducted, as a result of which the Hearing Committee found against Rao and recommended that he be placed on academic probation, seek professional counseling, and not be allowed to serve as a peer tutor or allowed to hold any medical school office.  On March 27, 2002, Dr. Homan notified Rao that the recommended sanctions would be placed immediately in force as interim sanctions pending any appeal.  He also notified Rao of his right to appeal the decision of the Hearing Committee.  Rao chose to appeal and, on April 10, 2002, after an April 3 hearing, the appeal panel found the evidence was sufficient to show that Rao committed the offense alleged and upheld the sanctions recommended by the Hearing Committee.

On April 25, 2002, Dr. Homan issued his final decision on both the academic dishonesty and unprofessionalism allegations.  In doing so, he summarized the findings of the Hearing Committees and the appeal panels in both cases, and concluded that “in light of these two, separate, serious incidents,” he would dismiss Rao immediately from the School of Medicine.  This, of course, led to the underlying lawsuit and to the issuance of the temporary injunction before us.      

Questions Presented

Tech challenges the temporary injunction by presenting four issues for our decision. Those issues are:  1) the trial court erred in denying Tech’s plea to the jurisdiction because Tech, as a state agency, has sovereign immunity; 2) the injunction is void because it fails to set forth the reasons for its issuance as required by Rule 683 of the Texas Rules of Civil Procedure; 3) the trial court abused its discretion in granting the temporary injunction because Rao failed to establish a probability of recovery; and 4) the temporary injunction is overly broad and constitutes an unconstitutional prior restraint on speech.

Jurisdiction

In argument under its first issue, Tech contends that Rao’s failure to name an individual in authority as a defendant in his suit deprived the trial court of jurisdiction to consider his claim for reinstatement because Tech, as a state agency, has sovereign immunity against a claim for unlawful actions of its officials.  Thus, as no suit of that nature may be maintained against it, the trial court had no jurisdiction to issue its interlocutory injunction.  In support of that position, Tech primarily relies upon 
Bagg v. Univ. of Texas Medical Branch
, 726 S.W.2d 582 (Tex. App.–Houston [14
th
 Dist.] 1987, writ ref’d n.r.e.).  In that case, the plaintiff pled a variety of causes of action arising out of an alleged wrongful employee termination against both supervisory employees of the University of Texas Medical Branch and the entity itself.  The trial court granted a dismissal and summary judgment against all the defendants.  As relevant here, the appellate court affirmed the dismissal against the Medical Branch and in doing so, opined in rather broad language that suits premised upon the alleged unlawful or unauthorized actions of state officials are not considered acts of the state agency, and because they are not state actions and the state cannot be a proper party to sue, trial courts have no jurisdiction and such suits may only be maintained against the individuals who were alleged to have acted unlawfully.  
Id.
 at 585.  Rao also cites cases such as 
Turner v. Texas Dept. of Mental Health & Mental Retardation
, 920 S.W.2d 415, 419 (Tex. App.–Austin 1996, writ denied); 
Dillard v. Austin Indep. School Dist.
, 806 S.W.2d 589, 598 (Tex. App.–Austin 1991, writ denied); and 
Battleship Texas Advisory Board  v. Texas Dynamics
, 
Inc.
, 737 S.W.2d 414, 418 (Tex. App.–Houston [14th Dist.] 1987, writ dism’d w.o.j), which cite and rely upon 
Bagg
 in arriving at similar holdings.

However, in 
City of Beaumont v. Bouillion,
 896 S.W.2d 143 (Tex. 1995), the Texas Supreme Court had occasion to consider whether there was an implied cause of action for damages as a remedy for unconstitutional conduct under the free speech and free assembly clauses of the Texas Constitution.  In the course of its opinion, it performed  an historical analysis of such constitutional questions and concluded that although no such actions for damages may be maintained, aggrieved persons may assert direct claims for 
equitable
 relief against governmental entities for violations of the Texas Bill of Rights.  
Id.
 at 149.  Earlier, in 
Director of Dept. of Agriculture & Environment v. Printing Industries Ass’n
, 600 S.W.2d 264 (Tex. 1980), the court opined that an entity or person whose rights have been violated by the unlawful action of a state official might bring a suit to remedy the violation or prevent its occurrence.  
Id. 
at 265-66
. 
 Indeed, in 
Alcorn v. Vaksman
, 877 S.W.2d 390, 403-04 (Tex. App.--Houston [1
st
 Dist.] 1994, writ denied), and 
Harrison v. Texas Dep’t of Criminal Justice–Institutional Div.
, 915 S.W.2d 882, 888 (Tex. App.--Houston [1
st
 Dist.] 1995, no writ), the same court that decided 
Bagg
 noted that although there may not be a cause of action for damages, a plaintiff whose constitutional rights have been violated may sue for equitable relief.  
See also Texas State Employees Union v. Texas Workforce Comm’n, 
16 S.W.3d 61, 66-67 (Tex. App.--Austin 2000, no pet.); 
University of Texas System v. Courtney
, 946 S.W.2d 464, 469 (Tex. App.--Fort Worth 1997, writ denied); 
Bohannan v. Texas Bd. of Criminal Justice
, 942 S.W.2d 113, 118 (Tex. App.--Austin 1997, writ denied).

The trial court had jurisdiction to consider Rao’s request for equitable relief.  Tech’s first issue is overruled.

Failure to State Reasons for Issuance

In pertinent part, Rule of Civil Procedure 683 provides that every order granting an injunction or restraining order  “shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained . . . .”  Under its second issue, Tech’s challenge is limited to the asserted failure of the temporary injunction to set forth the reasons for its issuance.  In the order granting the temporary injunction, the trial court found that Rao “tendered evidence of imminent harm, irreparable injury and an inadequate legal remedy.”

In advancing its challenge, Tech points out the admonition in 
Interfirst Bank San Felipe, N.A. v. Paz Construction Company, 
715 S.W.2d 640 (Tex. 1986), that the “requirements of Rule 683 are mandatory and must be strictly followed.”  
Id. 
at 641.
  Particularly citing 
Northcutt
 v. 
Warren, 
326 S.W.2d 10 (Tex. Civ. App.--Texarkana 1959, writ ref’d n.r.e.), and 
University Interscholastic League v. Torres
, 616 S.W.2d 355, 358 (Tex. Civ. App.--San Antonio 1981, no writ), Tech contends that the reasons stated by the trial court for its issuance of the temporary injunction were mere conclusory statements and were insufficient to comply with Rule 683 requirements of specificity.

Rao responds that this question was not preserved for appellate review because Tech never made any trial court complaint on the basis it now raises.  In relevant part, Texas Rule of Appellate Procedure 33.1(a) provides that as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was timely presented to the trial court with sufficient specificity to make the trial court aware of the grounds for complaint unless the specific grounds were apparent from the context.  At the injunction hearing, no presentation or objection was made to the temporary injunction on the basis now raised by Tech.

There is a split of authority on the question of whether a party can waive the right to complain of a failure of a temporary injunction to comply with Rule 683.  While the Texas Supreme Court has not written on the subject, the great majority of the Courts of Appeal who have considered the question, without a great deal of discussion, have concluded that the instruction of the court in 
Paz
 that the requirements of Rule 683 are mandatory means that the right to make appellate complaint of a failure to strictly comply with the rule is not waived by the failure to make a trial court complaint on that basis. 
See Big D Properties, Inc. v. Foster
, 2 S.W.3d 21, 23 (Tex. App.--Fort Worth 1999, no writ), and 
360 Degree Communications Co. v. Grundman
, 937 S.W.2d 574, 575 (Tex. App.--Texarkana 1996, no writ).  

However, in 
Emerson v. Fires Out, Inc.
, 735 S.W.2d 492 (Tex. App.--Austin 1987, no writ), an appeal from the grant of a temporary injunction, the court noted that the general principles of sound judicial administration would appear to require that any objections to the form and content of an injunction be pointed out to the trial court at a time when the errors could be corrected.  It further observed that “[i]t serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal.”  
Id
. at 494.  Applying Texas Rule of Appellate Procedure 52(a), the progenitor of present Rule 33.1(a), the court held that the failure to make a trial objection to the form of the injunction waived the right to an appellate complaint on that basis.  
Id. 
at 493-94.  We agree with that reasoning.

Bottomed on its premise that its right to complain was not waived, Tech also argues that the trial court’s stated reasons for issuing the injunction were not sufficiently specific to meet the requirements of Rule 683.  In doing so, it cites and relies upon 
University Interscholastic League v. Torres
, 616 S.W.2d 355 (Tex. Civ. App.--San Antonio 1981, no writ).  In that case, the court opined that a recitation of “no adequate remedy at law” and “irreparable harm” was conclusory and not sufficient to comply with Rule 683.  
Id. 
at 358.
   However, in the recent case of 
Pinebrook Properties, Ltd. v. Brookhaven Lake Prop. Owners Ass’n
, 77 S.W.3d 487 (Tex. App.--Texarkana 2002, pet. denied), the court held that a recitation of the reasons an injunction issued was because the defendants had no adequate remedy at law, the rights involved were unique and irreplaceable, and money damages would not be a sufficient remedy were sufficient to meet Rule 683 requisites.  
Id. 
at 504-05.  We agree with that holding.  The reasons listed in the injunction before us are very similar to those before the 
Pinebrook
 court and are sufficient to comply with Rule 683. For the above reasons, Tech’s second issue is overruled.

Failure to Establish Probability of Recovery

To be entitled to a temporary injunction, an applicant must show a probable injury and a probable right to recover at the final hearing.  
Walling v. Metcalfe
, 863 S.W.2d 56, 57 (Tex. 1993).  The decision to grant or deny a temporary injunction will only be reversed on a showing of an abuse of discretion.  
Anderson Chemical Company, Inc. v. Green
, 66 S.W.3d 434, 437 (Tex. App.--Amarillo 2001, no pet.).  
A trial court abuses its discretion when it misapplies the law to the facts or when the evidence does not reasonably support the findings. 
 Id. 
  In making our review, we draw all legitimate inferences from the evidence in the light most favorable to the trial court’s judgment.  
Id
.  Where, as here, the trial court made no findings of fact and conclusions of law, the judgment may be upheld on any legal theory supported by the evidence.  
Id
.

Tech argues that the injunction was improperly entered because there is no evidence showing that Rao was expelled for having engaged in protected speech.  In relevant part, article I, section 8 of the Texas Constitution provides:  “Every person shall be at liberty to speak, write or publish his opinions on any subject . . . .”  Those free speech rights are greater than those protected by the First Amendment to the United States Constitution.  
See e.g., Davenport v. Garcia
, 834 S.W.2d 4, 10-12 (Tex. 1992); 
Alcorn v. Vaksman
, 877 S.W.2d at 401.    The Texas Constitution, in positive terms, guarantees that every person has the right to speak, write, or publish their opinion on any subject, while the Federal Constitution expresses First Amendment rights in negative terms and simply restricts governmental interference with such freedoms.  
Jones v. Memorial Hosp. System
, 746 S.W.2d 891, 893 (Tex. App.--Houston [1
st
 
Dist.] 1988, no writ).  Even though a difference exists between the two guarantees, federal cases have historically been looked to by Texas courts as an aid in determining free speech questions.  The reasoning of the Texas courts being if the evidence is sufficient to show a violation of federal standards, it must also be sufficient to show a violation of state guarantees.  
See e.g., Vaksman
, 877 S.W.2d at 401.

Whether speech addresses a matter of public concern is determined by the content, form, and context of the speech.  
Connick v. Myers
, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).  When the speech relates to any matter of political, social, or other concern to the community, it addresses a matter of public concern and it is not necessary that the speech allege a breach of public trust.  
Id.
 461 U.S. at 146.  Indeed, the Supreme Court has held that a public employee’s comment in regard to an attempt upon the life of the President of the United States to the effect that if another attempt was made to assassinate the President, “. . . I hope they get him,” was a comment about a matter of public concern.  
Rankin v. McPherson
, 483 U.S. 378, 386-87, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987).

In 
Mt. Healthy City Sch. Dist. Bd. v. Doyle
, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a school district had failed to rehire a non-tenured teacher because of, among other things, a telephone call made to a local radio station.  The Court set out the standards by which an individual’s entitlement to constitutionally protected free speech would be determined.  Under that test, the individual must have shown (1) his conduct was protected, and 2) his conduct was a motivating factor in the action for which he seeks relief. 
Id. 
429 U.S. at 287.  

We agree with Tech that for Rao’s speech activities to be constitutionally protected, they must have addressed a matter of public concern.  
Id.
  His column was printed in the university newspaper, a publication which the trial judge could reasonably conclude was of general circulation.  Further, the column dealt with forensic pathology and medical technique, matters which the trial judge could reasonably conclude were of public interest and concern.  Additionally, the record reveals that Dr. Spencer’s complaint was fact intensive in the sense that it was directed at the references made by Rao in the column.

While it is true that certain conduct might be proscribed that has an incidental limitation on speech, such a proscription must further an important public interest, be unrelated to a general suppression of free speech, and be no greater than necessary to the furtherance of that interest.  
See e.g.,United States v. O’Brien
, 391 U.S. 367, 385, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968) (finding valid a federal law criminalizing the destruction or mutilation of a draft registration against a First Amendment challenge).  Under the testimony here, the trial judge could reasonably conclude Rao’s conduct did not fit within those incidental limits.  Viewed in the light by which we must view it in this limited interlocutory appeal, we cannot say the trial judge abused his discretion in granting the  temporary injunction.  Tech’s third issue is overruled.

Over Broad

We must next consider Tech’s fourth issue in which it contends the temporary injunction is overly broad.  In presenting this issue, Tech avers that paragraphs 8(d), 8(e), and 8(l) are overly broad.  In paragraph 8(d), and in relevant part, Tech is enjoined from making, condoning, or permitting “any statements to the effect that Rao has been expelled from the curriculum, that he has committed any conduct worthy of expulsion, or that he should be expelled from the curriculum.”  Paragraph 8(e), in relevant part, provides that Tech “shall not make - or condone or permit any faculty, staff or member of the administration to make - any statements to the effect that Rao’s autopsy article reveals that he lacks a moral compass or has a broken moral compass.”  In relevant part, paragraph 8(l) provides that Tech “shall not do any thing, or make any oral or written statement, that would have the effect of interfering with Rao’s ability to sit for any other examinations -licensing or otherwise - or interfering in any manner with Rao’s participation in the medical school curriculum pending the trial of this cause.”

Tech argues the above provisions are so broad and subject to subjective interpretation that “they virtually deprive” Tech of reasonable notice of what it is prohibited from doing.  In particular, it reasons that to be enjoined from making statements “to the effect” that Rao lacks a moral compass “could include almost any negative statement regarding Rao.”  It also posits that to be enjoined from making any statement or doing anything that would have the effect of interfering “in any manner” with Rao’s participation in the medical school curriculum “is so broad that it could include acts or statements that no reasonable person could anticipate as being embraced within the scope of the order.”  Accordingly, it argues, in those regards, the acts proscribed in the injunction are not sufficiently specific.

We agree that in certain aspects, the injunction is over broad and should be modified
(footnote: 3) in the following respects: 

Paragraph 8 is modified to read as follows:

d.  Texas Tech shall not make any statements that Rao has been expelled from the curriculum or that he has committed any conduct worthy of expulsion.  This is not intended, and shall not be construed as limiting the Defendant’s handling and defense of this litigation.

e.  This subparagraph is deleted from the injunction.

l.  Pending the trial of this cause, Texas Tech will allow Rao to sit for examinations - licensing or otherwise - customarily incident to Rao’s studies pending the final disposition of this cause and will allow him to participate in the medical school curriculum pending such trial.

To the extent we have modified the temporary injunction, Tech’s fourth issue is overruled.

In summary, all of Tech’s issues are overruled, with the exception that its fourth issue is granted to the extent of the modification of paragraph 8 set out above.  Accordingly, with the exception of the modification we have set out, the judgment of the trial court is affirmed. 

John T. Boyd

Senior Justice

Quinn, J., not participating.rportedly comprising the sum ordered payable under the judgment.  
Tex. R. App. P
.
 38.1(h) (requiring the parties to cite to authority and the record).  Thus, even if this argument was correct, which it is not, Baldwin failed to illustrate that the supposed error was harmful.

Second, the contention assumes that Garner agreed only to receive 20% of any “damages” recovered.  Attorney’s fees and interest are not considered damages, Baldwin continues, and because they are not, any such fees and interest must be omitted from the sum upon which Garner’s fee is determined.  In so construing the agreement, however, Baldwin ignored pertinent rules of contract interpretation.  

As previously mentioned, the entire document must be considered when determining the intent of the parties.  And, while paragraph three of the accord contains the phrase “damages per se,” those are not the only words used to describe Garner’s entitlement.  Again, the complete paragraph states:  “[
a]ny recoveries 
made in litigation for damages per se, I shall receive twenty percent (20%) of such 
in addition to the retainer
 after the first $100,000 has been recovered.”  (Emphasis added).  The phrase “any recoveries” is rather encompassing.  Indeed, the commonly known parameters of “any” include the idea of “every” and “all.”  
Merriam-Webster Collegiate Dictionary
 53 (10th ed. 1995).  And, authority generally requires us to assign words their common or plain meaning when interpreting a contract.  
Natural Gas Clearinghouse v. Midgard Energy Co.,
113 S.W.3d 400, 406 (Tex. App.–Amarillo 2003, pet. denied).
(footnote: 4)  And, to the extent that the parties expressly incorporated some sort of limitation in the paragraph, it appears in the phrase “after the first $100,000 has been recovered.”  Nothing is said about separating attorney’s fees or interest from the scope of “recoveries,” and, because the parties did not include the limitation now sought by Baldwin in the retainer agreement, we cannot add it.  
See Cross Timbers Oil Co. v. Exxon Corp.
, 22 S.W.3d at 26 (holding that the parties are bound by the terms that they use).
(footnote: 5)
  
Baldwin Argument Five – Duty to Disclose Anything to Garner

Next, Baldwin argues that he had no duty to disclose anything to Garner or acquire the Michigan Chestnut property in a way providing Garner with a fee.  We overrule the argument.

Regarding the duty to disclose, Baldwin’s argument is twofold.  He asserts that he had none because the contingency vesting Garner with an enforceable interest in the recoveries did not occur until after Garner terminated the attorney/client relationship with Baldwin on August 1, 1989.  Furthermore, the purported contingency consisted of obtaining a final judgment.  And, since the 1985 judgment was on appeal at the time Garner quit, it allegedly was not final.  We reject the contention. 

The record reveals that while Melroe appealed the judgment he and Baldwin nevertheless settled their dispute before August 1, 1989.  This is of import because authority holds that an executory contract (such as a contingent fee agreement) vests the attorney with an enforceable interest when the dispute is resolved through final judgment or 
settlement
.  
In re Willis
, 143 B.R. 428, 432 (Bankr. E.D. Tex. 1992)
.  Given that the claim of Baldwin arising from the judgment was actually settled before the appeal was dismissed or Garner purported to withdraw via the August 1st letter, the contingent fee agreement was no longer executory.  It was executed.  Thus, Garner’s interest in the recoveries had vested.

Similarly misplaced is Baldwin’s contention that he could use that portion of the judgment he owned to acquire the Michigan Chestnut interest to the exclusion of Garner.  Through the fee agreement, Garner did not simply receive 20% of the judgment.  Rather, he was entitled to 20% of what was 
recovered
 from Melroe after the first $100,000.  So, to the extent that Baldwin recovered sums exceeding $100,000, Garner was entitled to 20% of them.  This interpretation of the agreement also negates Baldwin’s contention that he was entitled to allocate receipts from the Michigan Chestnut asset to interest first and thereby reduce the sums recoverable by Garner.  Again, Garner was entitled to 20% of “any recoveries,” per the agreement, not simply 20% of what was left after payment of interest upon the principal reflected in the 1985 judgment.
(footnote: 6)
 Finally, Baldwin cites two cases purportedly holding that Garner could only obtain an interest in sums he personally recovered on behalf of his client.  Neither so state, however.  The first, 
Casey v. March
, 30 Tex. 180 (1867), dealt with whether an attorney could have a 
possessory lien
 on a judgment itself or monies payable under it before they were collected.  The second, 
Raley v. Hancock
, 77 S.W. 658 (Tex. Civ. App.–Austin 1903, no writ), also dealt with the matter of 
liens
 upon monies collected by another attorney.  Yet, neither held that an attorney who executed a contingent fee agreement with his client had a contractual interest only in funds he personally collected.      

Baldwin Argument Six – No Evidence of Damages

Next, Baldwin attacks the jury’s verdict as it relates to the quantum of damages recoverable by Garner.  The attacks are twofold.  First, Baldwin suggests that the percentage received was to be paid only from damages recovered, not attorney’s fees or interest.  We addressed and rejected that allegation earlier.  Again, it requires the injection into the retainer agreement of words or limitations the parties omitted.

Second, Baldwin again posits that he was entitled to allocate whatever recovery he received to post-judgment interest which accrued on the Melroe judgment.  This argument too has been addressed and found inapposite. 

We further note that the evidence of record illustrates Baldwin recovered in excess of $1,000,000 due to the judgment obtained through the efforts of Garner and per the retainer agreement.   And, though that sum far exceeded the $100,000 threshold mentioned in the fee agreement, Baldwin paid Garner none of the excess.  Thus, more than a scintilla of evidence appears of record illustrating that Garner was damaged in the amount found by the trial court, 
i.e.
 $152,621.73.

In sum, we overrule this argument as well.   

Baldwin Argument Seven – No Evidence of Fraud

Next, Baldwin claims that there was no evidence presented to satisfy any element of fraud.  Again, his argument is twofold.  First, he contends that Garner suffered no injury because the retainer agreement afforded him no interest in recoveries from Melroe and because attorneys other than Garner effectuated the recoveries from Melroe.  We previously addressed and rejected each of these propositions.  So, they cannot be used as a way of illustrating that Garner suffered no injury.

As his second ground, Baldwin contends that there is no evidence illustrating Garner relied on any misrepresentation of Baldwin regarding the ability to recover from Melroe.  To assess the accuracy of this contention, it is imperative to discuss the form of the question submitted.  It asked:  “[d]id the Baldwins commit fraud against Templeton & Garner in regard to the Irving Melroe bankruptcy?”  Accompanying the question was the following instruction:

Fraud occurs when –

a party makes a material misrepresentation,

the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

the misrepresentation is made with the intention that it should be acted on by the other party, and

the other party acts in reliance on the misrepresentation and thereby suffers injury.

*     *     *

Fraud also occurs
 when –

a.  a party conceals or fails to disclose a material fact within the knowledge of that party,

b.  the party knows that the other party is ignorant of the fact and does not have  an equal opportunity to discover the truth;

c.  the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and 

d.  the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

(Emphasis added).  The final portion of the issue simply asked the jury to “[a]nswer ‘yes’ or ‘no,’” to which it answered “yes.”  

As can be seen, fraud was submitted through two differing theories.   
See Springs Window Fashions Division, Inc. v. The Blind Maker, Inc., 
03-03-00367-CV, 2005 Tex. App. WL 1787440 (Tex. App.–Austin July 29, 2005, no pet. h.) (noting the various legal theories on which fraud can be based).  And, while reliance was an element of the first, it was not of the second.  So, in contending that there was no evidence of reliance, Baldwin’s attack logically affects only the first way in which the jury could find fraud; he says nothing of the second.  And, because the jury could have concluded that Garner established fraud under the second theory and Baldwin does not address it, we cannot sustain the argument.  
Daves v. Commission Lawyer Disc.
, 952 S.W.2d 573, 580 (Tex. App.–Amarillo 1997, pet. denied) (stating that purported error regarding a  jury’s answer to a particular question is harmless when the jury’s other findings are sufficient to support the judgment).

First Garner Issue – Punitive Damages

Garner initially contends that the trial court erred when it denied him punitive damages even though the jury awarded him same.  This was purportedly error because he proved fraud and the ensuing injuries were other than those arising from the breach of the underlying fee agreement.  We overrule the issue.

A claim must sound in contract if liability arises from the contract or is determined by reference to the contract.  
In re Weekley Homes, L.P.
, 04-0119, WL 2807410 *3 (Tex. October 28, 2005).  Yet, if founded upon general duties imposed by law irrespective of the contract, it may sound in tort.  
Id.
  The former rule encompasses the situation at bar.  

Though Garner claimed that he was defrauded, the basis for those allegations was inextricably tied to the retainer agreement and contractual duties imposed by it.  The latter, not general duties imposed by law, obligated Baldwin to give him 20% of “all recoveries” above the initial $100,000.  Moreover, it was that percentage that Garner sought and received, which percentage again was set by contract as opposed to general legal duties.  Indeed, without the retainer agreement and the obligations arising under it, he would have had no general right to 
20% of “all recoveries.”  Simply put, what Garner wanted was the benefit of his bargain with Baldwin irrespective of the label placed on the demand.  
See Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.
 960 S.W.2d 41, 45 (Tex. 1996) (recognizing precedent holding that one’s claim sounds in contract as opposed to tort when the claimant is actually attempting to recover the benefit of the bargain under the agreement).
(footnote: 7)  Given this, we cannot but hold that Baldwin’s liability arose from the contractual retainer agreement and sounded in contract.  Because it did, exemplary damages were not recoverable, and the trial court did not err in denying Garner same.  
See
 
Jim Walter Homes, Inc. v. Reed
, 711 S.W.2d 617, 618 (Tex.1986); 
see also Weber v. Domel, 
48 S.W.3d 435, 437 (Tex. App.–Waco 2001, no pet.) (holding that punitive damages are not recoverable for a breach of contract).

Second Garner Issue – Frivolous Suit

The next and final issue raised by Garner concerns the trial court’s refusal to sanction Baldwin, under §17.50(c) of the Texas Business and Commerce Code, for initiating and prosecuting suit against him.  We overrule the issue.

Statute authorizes a trial court to award a defendant reasonable and necessary attorney’s fees against one prosecuting a deceptive trade practice claim.  
Tex. Bus. & Com. Code Ann
.
 §17.50(c) (Vernon 2005).  However, the trial court must first find that the cause of action was groundless in fact or law, brought in bad faith, or brought for the purpose of harassment.  
Id
.  Moreover, the decision whether to sanction one under §17.50(c) lies within the trial court’s discretion.  
Riddick v. Quail Harbor Condominium Ass’n., Inc.
, 7 S.W.3d 663, 678 (Tex. App.–Houston [14
th
 Dist.] 1999, no pet.). 

Here, Baldwin alleged (in his live petition) a myriad of bases purportedly illustrating how Garner committed deceptive trade practices.  Yet, Garner did not illustrate how each was groundless or initiated in bad faith or for purposes of harassment.  For instance, nothing was said about the allegations involving the decision of Garner to hire as attorneys the offspring of several people he agreed to sue on behalf of Baldwin.  Nor does he address the allegation that hiring those attorneys purportedly created a conflict of interest.  We do not mean to say that such circumstances evinced a deceptive trade practice.  Rather, we mention the allegation simply because it was one that Baldwin cited as a deceptive trade practice and Garner had to address to carry his burden on appeal.  In other words, he had to explain why it, and every other supposedly bad act of Garner mentioned in Baldwin’s live petition, was encompassed within §17.50(c).  Otherwise, it could not be said that he proved the trial court abused its discretion in denying recovery under the statute.
(footnote: 8)  Indeed, while some of the allegations may have fallen within the scope of §17.50(c), others may not have.  So, it was incumbent upon Garner to show why each did.

Having denied each issue and contention raised by the litigants, we affirm the judgment of the trial court.  

Brian Quinn

          Chief Justice

Reavis, J., dissenting.

FOOTNOTES
1:
John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.  Tex. Gov’t Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 

2:
Attending an autopsy is part of the medical school curriculum.

3:
Tex. R. App. P. 43.2(b).

4:
5:
6:
7:
8: